NEW YORK STATE BRIDGE AUTHORITY, Plaintiff, v. FRANK C. MOORE, as Comptroller of the State of New York, Defendant.

Third Department, December 29, 1948.

*Hawkins, Delafield & Wood,* attorneys (*L. L. Delafield* and *B. L. Visscher* of counsel), for plaintiff.

*Nathaniel L. Goldstein, Attorney-General* (*Wendell P. Brown, Solicitor-General,* and *Kent H. Brown, Assistant Attorney-General,* of counsel), for defendant.

BREWSTER, J. This is the submission of a controversy upon an agreed statement of facts.

When the Mid-Hudson Bridge across the Hudson River at Poughkeepsie, New York, was authorized by chapter 900 of the Laws of 1923, it was planned as a toll bridge until its revenues had liquidated the State's capital outlay therein. That statute provided that the net revenues from the tolls were to go to the State until they equalled "the entire investment of the State for [the] original construction" of the bridge. Thereafter, the State constructed the bridge with State funds and completed and opened it for public use on or about August 25, 1930. The State's total expenditure in so doing amounted to the principal sum of $6,002,575.41, of which $5,153,083.73 came from the proceeds of two State bond issues (New York State General Improvement Bonds), issued pursuant to chapter 17 of the Laws of 1926 and chapter 2 of the Laws of 1927, respectively. The interest cost to the State on account of said bonds, the proceeds of which were so used, amounts to $2,517,070.46.

The plaintiff is a public corporate entity and has jurisdiction and control of the aforesaid bridge and two other bridges over the lower Hudson and the Kingston-Rhinecliff ferry, later built and acquired. (Public Authorities Law, art. 3, tit. 2.) Authorization has recently been made whereby it may construct another Hudson River toll bridge to supplant the Kingston-Rhinecliff ferry and finance the same by the issuance of its bonds subject, however, to the limitation that its outstanding bonded indebtedness shall not exceed eight million dollars in addition to a further amount authorized to meet a requirement that before it may proceed with the new bridge project, " * * * the unpaid balance of the state's claim for the [its] entire investment for the original construction of the Mid-Hudson bridge * * *

shall be funded and repaid to the state * * *." (L. 1947, ch. 189; Public Authorities Law, § 528, subd. 6-a; § 528-a, subd. 8; § 532, subd. 1; § 532-b.) The defendant has included in the amount he has certified as the State's entire investment in the Mid-Hudson Bridge, the aforesaid interest costs which it has and in the future will be obliged to pay to the holders of its bonds, the proceeds of which went in the building of the Mid-Hudson Bridge. Defendant contends that to be the correct view and plaintiff to the contrary. We are, therefore, to determine whether in the light of all the relevant statutory history of the matter the State's entire investment for the original construction of the Mid-Hudson Bridge includes its interest cost on its borrowings so invested.

Patently the interest cost was not an "investment" in the common business use of the word. Neither was the State's expenditure of the principal fund because it was to bring no return of anything comparable in a business transaction. To find the intended meaning of the statutory phrase we must go beyond the definition of "investment" as employed in ordinary finance and consider the statutory plan, its policy and history. The phrase originated in 1923, and has survived to date throughout nearly a score of related subsequent legislative enactments. We may safely note that by the year 1923, the revolutionary change wrought by motor vehicle transportation was acutely under way and that the great facility of the lower Hudson's navigability was fast becoming a difficult obstacle in the pathway of the new mode. To surmount that, a relatively new governmental policy adopted a part-time use of an old device, i.e., a toll bridge. The People of the State would share principally in the cost of the original construction and the portion of the public most directly benefited, the users of the bridge, would by their tolls return the State's *investment*. It was an investment of the public's money, part of which it borrowed, in a bridge and also in the general welfare. The return to the "investor" was no gain in money but an enhancement of the public weal, and the ultimate ownership of the bridge. The public money *so devoted* was to be returned by those first and most directly benefited, and thereafter it was provided that the bridge would be owned and maintained by the State and be as free to all as any highway.

When the bridge was contemplated and first arranged for, doubtless the State's need to borrow money to make its investment therein was envisioned. But that was not a novelty. The era of building improved State highways and financing the

cost by State bond issues was well under way. The investor was sovereign yet sought no recoupment of its outlay save in the use of the questioned phrase, which, in characterizing the outlay as an investment, inescapably embraces the concept of a conversion of money into another kind of wealth. Here it was changed into a bridge. But the interest cost to the State was not so converted and in that sense was not invested. A sum of money is invested "whenever its amount is represented by anything but money." (*People ex rel. Parker Mills* v. *Commissioners,* 23 N. Y. 242, 244.) No part of the State's wealth is represented by the interest charges in question. Such, like many other overhead costs, was a detriment it suffered in order to make its investment. This view is supported by the language employed in the various enactments, subsequent to 1923, wherein it was provided that (a) as to the expense incurred by the counties of Dutchess and Ulster in acquiring, for the State, lands and easements for the bridge and approaches, and (b) as to the bonded indebtedness of the plaintiff and its predecessor incurred in the construction and acquisition of other bridges and the Kingston-Rhinecliff ferry over and across the lower Hudson, the net revenues from tolls and earnings were to go to the payment of the principal and interest of all bonds issued for said purposes. (L. 1925, ch. 13, § 3; L. 1932, ch. 548, §§ 1, 3; L. 1939, ch. 870; L. 1947, ch. 189, § 19, now Public Authorities Law, § 538, subd. 2, par. [b]). In all of said enactments the provision as to the return to the State of its outlay in the Mid-Hudson Bridge was re-enacted in substantially the same language as originally used, no reference being anywhere made to a return of the interest cost to the State on account thereof.

The seeming inordinate relation between the aggregate of the amounts of the State's borrowing for its outlay in the Mid-Hudson Bridge and its interest cost, due to the long term maturities of the bonds, is also a circumstance which favors the view above expressed. In incurring such heavy cost the State made no express provision for its reimbursement. Had it done so the ultimate objective, that that bridge and the others be free of tolls, would, of course, have been accordingly delayed. To now incorporate such cost into the meaning of its use of the word "investment" would, in the light of later and now existing arrangements, produce the unusual result of paying interest on sums borrowed to pay interest, because the return of the State's investment is now, by chapter 189 of the Laws of 1947 (Public Authorities Law, § 538, subd. 2, par. [c], § 532-b) an obligation of the plaintiff which it may presently discharge

only from the proceeds of its further bond issues as authorized.

It should be ordered and adjudged that the cost of the interest charge upon the State bonds, the proceeds of which it applied to the original construction of the Mid-Hudson Bridge at Poughkeepsie, New York, pursuant to law, forms no part of the investment of the State for the original construction thereof, and that the certificate of the defendant comptroller should be amended accordingly.

HILL, P. J. (concurring). I concur in the result. The language of the statute (L. 1923, ch. 900) provided that the bridge should be free for the public when the tolls over and above the expenses of maintenance and operation " shall equal the entire investment of the state for original construction * * * ". Had the Legislature intended that interest on the portion of the cost of original construction which was funded be paid from tolls as well as expenses of maintenance and operation, the statute would have so stated.

I find no support for this conclusion because the interest on the bonds issued to provide funds to pay a portion of the cost of " original construction " from date to maturity was about 50% of the principal of the bond issue. The aggregate interest on the bonds was determined by two factors, the rate of interest and the number of years which would transpire between issuance and maturity. The amount of each of these factors was fixed by fiscal agents of the State under statutes applicable thereto.

HEFFERNAN and RUSSELL, JJ., concur with BREWSTER, J.; HILL, P. J., concurs in a separate memorandum; DEYO, J., dissents on the ground that the costs of financing the original construction of the bridge constituted an essential part of the State's entire investment therein.

It is ordered and adjudged that the cost of the interest charges upon the State bonds, the proceeds of which were applied to the original construction of the Mid-Hudson Bridge at Poughkeepsie, New York, pursuant to law, forms no part of the investment of the State for the original construction thereof, and that the certificate of the defendant comptroller be amended accordingly, without costs.